Commonwealth Electric Co. v. Rooney.

## Commonwealth Electric Company v. Harry Rooney.
### Gen. No. 13,584.

1. TRIAL—*what essential to preserve for review objection to particular judge.* In order to preserve for review the question of the propriety of a particular judge presiding at a trial, it is essential that an objection be made and that the same, together with the basis thereof, and an exception to the ruling of the court thereon, be supplied in the record by means of a bill of exceptions.

2. JUDGE—*when objection for alleged prejudice waived.* Failure to specify in the written motion for a new trial containing the points relied upon, the objection to the presiding judge, waives the question.

3. DECLARATION—*how question whether, states cause of action, determined.* The question as to whether a declaration states a cause of action is determined by an inspection thereof without reference to the evidence.

4. DECLARATION—*when states cause of action for failure to furnish safe place to work sufficient after verdict.* A declaration is sufficient which charges that the defendant negligently provided a dangerous and unsafe place, of which the plaintiff had no knowledge or means of knowledge, and that, because of such negligence of the defendant, the plaintiff was injured, without his fault.

5. MASTER AND SERVANT—*scope of duty to furnish safe place to work.* The duty of the master to exercise reasonable care to furnish the servant a reasonably safe place in which to work, is not limited to the time when the servant commences work, but is continuous, and if while the servant is working at the place furnished

by the master, it is, by reason of the master's negligence, made unsafe and . dangerous, without the servant's knowledge, and the servant is thereby injured, while exercising ordinary care, the master is liable.

6. ˙ VARIANCE—*when objection for, comes too late.* An objection for variance cannot be first made on appeal.

7. NEGLIGENCE—*when proof of custom competent upon question of.* If an injury has resulted by reason of a master's departure from an established custom of his business, proof of such custom is competent and material.

8. INSTRUCTION—*upon ordinary care approved.* An instruction upon the subject of ordinary care is proper which tells the jury that if they find from the evidence "that the plaintiff, at the time of and prior to the accident in question, exercised that degree of care for his own safety that an ordinarily prudent person would have exercised under the same circumstances," then they should find that he exercised ordinary care.

9. VERDICT—*when not excessive.* A verdict for $30,000 is sustained under the evidence recited in the opinion.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed January 13, 1908.

F. J. CANTY, J. C. M. CLOW and E. E. GRAY, for appellant; H. E. LONG, of counsel.

MORSE IVES, for appellee; EARL J. WALKER, of counsel.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment in favor of appellee and against appellant for the sum of $30,000. The declaration, as amended, contains four counts, but the court instructed the jury to disregard the second, third and fourth counts and the case went to the jury on the first count only. The appellant pleaded the general issue. In the first count it is averred, in substance, as follows: The defendant was a corporation and possessed and owned certain wires strung on poles, etc., and used by it in carrying on the business of illumination by electric lights, and had erected one

of said poles at a point in an alley west of Elston avenue and north of Armitage avenue, in the city of Chicago, over and upon which it had caused its said wires to be strung. June 11, 1902, plaintiff was in defendant's employ as a lineman to connect up a three-faced ground, called a lightning arrester, on poles and crossbeams with wires attached thereto, at the place aforesaid. "Defendant, disregarding its duty to furnish plaintiff a reasonably safe place in and around which to work, conducted itself so carelessly and negligently in that behalf, that it provided a dangerous and unsafe place, as defendant, by its agents and servants then knew, or in the exercise of ordinary care might have known, but of which plaintiff did not know and had not the means of knowing, that in consequence of said negligence of defendant, at the time and place aforesaid, and while plaintiff, in said capacity as a lineman, was working upon said pole and appliances, as aforesaid, he, accidentally and without any fault or negligence on his part, came in contact with live wires heavily charged with electricity, and was thereby then and there severely shocked, cut, bruised, burned, wounded and injured both internally and externally," etc.

The defendant pleaded the general issue. At the close of the plaintiff's evidence, and also at the close of all the evidence, defendant's counsel moved the court to instruct the jury to find the defendant not guilty, and presented with each of said motions an appropriate instruction. The court refused said motions, and the jury found for the plaintiff and assessed his damages at the sum of $30,000, and the court, after overruling motions by the defendant for a new trial and in arrest of judgment, rendered judgment on the verdict. The case has been tried three times. On the first trial, the Hon. Axel Chytraus, J., presiding, the jury found the issues for the plaintiff and assessed his damages at the sum of $20,000. A new trial was granted, on defendant's mo-

tion, and on a second trial, the Hon. Arthur H. Chetlain, J., presiding, the jury disagreed. The third trial is the one in question. Following are the contentions of plaintiff's counsel, which we will consider in the order in which they are made by counsel:

1. It is assigned as error and now contended, that "the court, Judge Chetlain presiding, erred in sustaining plaintiff's motion, in setting the case for trial before himself, with the record in the case showing that objections were made to said Judge Chetlain hearing the case because of prejudice toward the defendant, and because the defendant believed it could not get a fair trial of said cause before said Judge Chetlain, as shown by the record then on file." There is no bill of exceptions showing any objection to Judge Chetlain presiding at the trial, when the cause was called for trial before him, April 10, 1906. That trial was the second trial of the cause in which the jury disagreed. February 3, 1906, the court, Judge Chetlain presiding, entered an order as follows: "Ordered by the court that said cause be and is hereby set for trial on Tuesday, March 6, 1906, A. D. It is further ordered that leave be and is hereby given the defendant to file its bill of exceptions herein within ten days from this date." No bill of exceptions to the order was filed. June 13, 1906, the following order, Judge Chetlain presiding, was entered: "On the stipulation of the parties to this suit filed, it is ordered that this cause be and is hereby passed to be placed at the head of the supplemental calendar." October 8, 1906, the cause was called for trial and a jury impaneled, and the trial resulted in the judgment appealed from.

No jurisdictional question is involved. Judge Chetlain is one of the judges of the Superior Court of Cook county and had jurisdiction of the parties and the subject-matter of the cause. The contention, considered on its merits, is transparently untenable. But the defendant is not in a position to make the contention for two reasons. The record shows no objection

made before Judge Chetlain to his presiding at the trial, and in the defendant's written motion, specifying grounds for the motion, the trial of the cause before Judge Chetlain is not specified as ground for a new trial, and the defendant is limited here to the grounds specified in its written motion for a new trial. Railroad Co. v. McMath, 91 Ill. 104.

2. It is contended that the first count of the declaration on which the verdict rests, does not state a cause of action. In passing on this contention, we must look solely to the count, without any reference to the evidence. It is true that it might have been better to have averred the specific negligence relied on; but it is averred that the defendant negligently provided a dangerous and unsafe place, of which the plaintiff had no knowledge or means of knowledge, and that, because of such negligence of the defendant, the plaintiff was injured, without his fault. Suppose an amendment to be filed to such a count as the one in question, setting up specifically the negligence relied on, in respect to the place where plaintiff was working, and a plea of the Statute of Limitations should be filed to it. Could it be held that the amended count stated a new cause of action? We think not. The averment would still be of negligence in providing an unsafe and dangerous place in which to work.

A general charge of negligence is not new in pleading. It was good in the time of Chitty; 2 Chitty on P'g., 9 Am. ed., pp. 710, 713. Such a charge was held sufficient in Chicago City Ry. Co. v. Jennings, 157 Ill. 274, and in Grace & Hyde Co. v. Sanborn, 124 Ill. App. 472. In Sargent Co. v. Baublis, 215 Ill. 428, the objection was the same as in this cause, in respect to which the court say:

"It is next contended that the declaration is fatally defective in not alleging any actionable negligence. The negligence alleged is, that the defendant negligently and carelessly permitted the grindstone to be and remain in a defective and dangerous condition, and

there is no statement what defect existed in it or how or why it was dangerous. This objection to the generality of the statement, without setting out the nature of the alleged defect, is one that should have been taken by demurrer, and the defect was cured by the verdict." Citing C., B. & Q. R. R. Co. v. Harwood, 90 Ill. 425, and B. & O. S. Wes. Ry. Co. v. Keck, 185 *ib.* 400.

Evidently the contention that the count does not state a cause of action is an afterthought of counsel. They did not demur to the count, but pleaded to it issuably, and now, after a trial involving large expense, they advance this contention for the first time. Without passing on the question whether the count is obnoxious to general demurrer, we hold it good after verdict.

Counsel say: "The count under consideration shows and alleges that the wires upon which plaintiff was working were charged with electricity, and while so charged the plaintiff went to work thereon." We do not so understand the count in question. It is averred that the wires were charged with electricity, at the time of the accident, but it is not averred directly or indirectly, at what time the electrical current was turned onto the wires. The count is entirely consistent with the fact, that when the plaintiff commenced to work at the place in question the wires were not charged with electricity, but were so charged thereafter, while he was working at that place.

3. Counsel contend that there is no evidence of negligence of the defendant entitling plaintiff to recover. This contention involves consideration of the evidence, which is quite voluminous, twenty-one witnesses having testified, many of them at great length.

A map or plat of the territory in which plaintiff was working before and at the time of the accident is in evidence and shows the streets, etc. The east and west streets are North avenue, Wabansia avenue, Bloomingdale road and Armitage avenue. North

avenue is the most southerly street, and the other streets above named lie north of it in the order named. Ashland avenue lies north and south and intersects all the streets above named except Bloomingdale road, which terminates at Ashland avenue. California avenue lies northeasterly and commences at the north end of Ashland avenue, and intersects Elston avenue, which lies northwest and southeast. The pole where the accident happened is in the alley north of Armitage avenue and west of Elston avenue. The place where the old and new wires were connected is about opposite the alley next south of Wabansia avenue, and the school house mentioned in the evidence is west of Ashland avenue and about opposite the place where the wires were connected. The Naugle Tie Co.'s yard is northeast from that part of Elston avenue lying north of Armitage avenue. From the pole where the accident occurred to the place where the old and new wires were connected is from six blocks to a mile.

The plaintiff was within a few days of being thirty-one years of age at the time of the accident, and had been, at that time, in the employ of the defendant about two years, and, once before his last employment, had been in defendant's employ four years. He was an experienced lineman, and had been engaged in that occupation for about fourteen years. George W. Beale, defendant's foreman, who directed and supervised the work which plaintiff was doing, testified in respect to plaintiff: "He was a good lineman; there was none better; he was one of the best linemen in the country; he was looked up to as an expert lineman, a good A No. 1."

Plaintiff was employed by the defendant as a lineman. Plaintiff testified in substance that in the afternoon of June 10, 1902, he put on some lightning arresters on a pole in an alley north of Armitage avenue and west of Elston avenue, in the city of Chicago; that there were three wires lying on one end of the cross-arm of the pole and not fastened to the insula-

tors, and no wires on the other end of the cross-arm, and that, on June 10th, there was no current passing through or over those wires that he knew of. June 11th he did some other work in the forenoon, and after dinner Beale, the foreman, said to him, "Harry, you get what stuff you need and go and finish up that pole and box, and finish up that job." Plaintiff then got the necessary material for the work to be done, and started to go to the pole where he worked on June 10th putting on lightning arresters, but before getting there he returned to the supply wagon and said to Beale, "How is them wires up there? Had I better have a pair of rubber gloves? He said, 'No, they are dead, nothing in them.'" Plaintiff then went to the pole, taking with him a hand line or rope with which to pull up the material needed from his helper, the ground man at the foot of the pole. When he climbed the pole he went to place his "safety" (which is a belt worn around the person) on the pole, and the inside wire lay between the first pin and the pole, and he took hold of the wire and turned it a little to one side and felt what is known to linemen as induction, when he descended the pole and went toward the supply wagon, and when about thirty-five feet distant from the wagon, Beale, the foreman, said to him, "What is the matter, Harry, what do you want?" and he said, "I feel a little induction on there, George," and Beale said, "I don't see where in the hell you are getting it; the wires are dead." He paid no attention to this, but went to the wagon and took a pair of rubber gloves from it, when Beale said to him, "Haven't I told you they are dead?" and witness said, "I've got a little induction on them," to which Beale replied, "Oh, that is nothing." On cross-examination plaintiff testified: "Static is what is known as foreign or induced current, which would be caused by dead wires coming in closely to or running parallel to heavily charged wires, and this causes static or foreign induction current. It is a mere tingling sensation.

For instance, when you are working on the wire, it will keep tingling at you and bothering you like a tickling sensation. In fact every lineman knows it to be a nuisance and bother when working." The evidence, including that of defendant's witnesses, is that it is not dangerous to handle wires affected by induction. Continuing in his examination in chief, plaintiff said: "I went to straighten up to unhook my safety, in order to throw a little slack into the safety, so as to unsnap it, and as I did so, I came in contact, in some way, with the wires on the cross-arm. All I can tell is, I was straightening up, and as I was straightening up all I heard was bizz-bizz. That is all I know about it." Plaintiff then proceeded to describe his injuries, which will be referred to hereafter. On cross-examination plaintiff testified that in the afternoon of June 10th he put up the arrester boxes, but did no wiring; that he fastened the wires June 10th; also that when he quit work on the 10th the wires on the pole were dead. Daniel J. Bagley, a lineman in defendant's employ, testified that on June 11th he saw plaintiff coming under the viaduct, and he asked for something, and he heard Beale say to him, "I don't see where you are getting it; those wires are dead," and Rooney said, "I can't see it neither, but I am getting it," and then plaintiff and Beale got close together and witness heard nothing more said. The witness, Bagley, was, at the time, up on a pole about twenty-four feet from the ground. The viaduct referred to by the witness was a short distance from the pole where the accident happened. This witness further testified that on June 11th he was working on a pole, and asked Beale if he would need rubber gloves, and Beale said "No, the wires are dead."

The plaintiff was engaged in construction work on the pole when he was injured, and the evidence is, that it is usual not to charge the wires with electricity till the construction work is complete. Mr. Hughes, an electrical construction foreman, called by defendant, testified, on cross-examination, as follows:

"Q. You have dead circuits during the work of construction, don't you? They are hardly circuits until they are completed, and then they are made alive; that is the last act, isn't it, in the usual and ordinary course, to make it alive? A. Yes."

Philip Bender, an electric lineman, called by plaintiff, and who had been in defendant's employ, testified: "The custom was to do the construction work first, do everything first, and get everything ready, and then cut it in on the live wire." By "cutting in" is meant, as shown by the evidence, connecting the new dead wire with live wires. Sherman M. Neff, a lineman, called by plaintiff, also so testified. Donovan, called by defendant, testified on cross-examination, that by Beale's order, he helped plaintiff, June 10th, at the pole on which the accident happened, and heard a conversation between Beale and the plaintiff on the afternoon of that day, when the following occurred:

"Q. Do you remember what the conversation was? A. Well, it was relative to the finishing of the work. Harry said something about finishing the work before transmission wires were put in, and Beale said, 'No, let it go; we have something else to do; we will come back and do this some other time.' Rooney said he wanted to finish the work before the juice was put in. That was about three o'clock of the afternoon of the 10th. Beale told him to wait and do it later. We then left the job and went to Clybourne and Ashland avenues, where the wagon was." The electric current is called "juice" in the jargon of linemen and others employed in electrical work.

Plaintiff's evidence as to the conversation between him and Beale, when he went to the wagon for rubber gloves, is contradicted by witnesses called by the defendant. Beale was questioned in chief and answered as follows:

"Q. Did you at that time say, 'You don't need gloves; they are dead?' A. No, sir; told him my general orders; they are always dead.

Q. General orders? A. Yes, sir, that is, with me, general orders, always dead. What would I tell you to put gloves on for if you worked at that business—would I tell you what to do?

Q. Well, did you say that to him; that is what I want to get at? A. No, I did not.

Q. Do you mean always dead or always alive? A. I claim the wire is always dead to any man who ever worked for me. I haven't the license to say that, but I always say, 'Play them wires alive.'

Q. That is what I want to know. A. You don't understand it, maybe.

Q. No, I don't. A. Play those wires alive, dead or anything else. In stringing new wires, that is my idea, to tell them to play them alive.

Q. In the profession, then, they are always known as the same, and they must play them alive? A. Yes."

If what plaintiff's counsel say of Beale's appearance on the witness stand is true, the jury could not have been favorably impressed by his evidence. We cannot know from the record how he appeared, but his testimony indicates indifference, flippancy, callousness and recklessness. It became necessary for defendant's attorney to reprove him. The following occurred in his cross-examination:

"Q. Wasn't Fox his helper on the 11th? A. Yes—I am under oath now, recollection; I will tell you that.

Q. I understand, and whenever you are not under oath let me know. A. Yes, you bet your life I am—you bet your life I will." * * *

"A. That's the eye.

Q. That's the eye, you say? A. Yes.

Mr. Gray: This is really not a laughing matter.

A. Well, what are you laughing at? I can laugh if I want to, I guess."

This witness refers to plaintiff as "his job lots," saying, "I left on Elston, his 'job lots' there at the corner to finish that job, and I distributed them out, along down there to the tie works."

Fox, who was plaintiff's helper, called ground man, and whose place was at the foot of the pole on which plaintiff was at work, testified that he did not hear plaintiff ask for gloves, or Beale say that he didn't know what he wanted them for, that the wires were dead; that plaintiff said it was hot up there; that he, witness, saw the gloves come down and heard Beale ask Rooney if he was through, and he said he was, and Beale told him to keep his gloves if he was not through, as it was hot up there. Martin Matson, the driver of the supply wagon, testified that, June 11th, he took plaintiff in the wagon to within a short distance of the pole where he was hurt, and saw him go to the pole, and in about five or ten minutes thereafter saw him coming toward the wagon where Beale was, and Beale said to him, "What are you after?" or something, and he said, "I am after my gloves, rubber gloves; that stuff is hot" (or something) "up there." Fox further testified that he saw plaintiff drop his gloves, and Beale said to him, as nearly as he could recollect, "Look out, Rooney, that's hot stuff up there," and Rooney said, "That's all right; I'm coming down, I am through," or something similar to that.

Andrew Jackson Hudson testified that he resided at Moline, Illinois, and was an electrician, and at the time in question was working for Westinghouse, Kerr & Co., of New York, in the yard of the Naugle Tie Co. in Chicago, and, at the time of the accident, was sitting with Beale against the wall of the railroad company, nearly opposite the pole on which plaintiff was, and that all at once he heard something drop on the ground and saw it was a pair of white rubber gloves, and he said to Beale, "Are those wires alive?" and he said, "Yes," and witness said, "Why has he thrown his gloves down?" and he hallooed up the pole, "Look out now, they are hot," and plaintiff said, "I am through," or "done." It appears from the testimony of this witness that he didn't know Beale at the time of the conversation he relates; that he just happened along

there on his way to the tie yard, and sat down by Beale and said, "How are you?" and Beale said, "How are you?" His cross-examination illustrates that he has a very eccentric memory, to say the least. He testified that he had been living with his sister about three weeks at the time of the accident, on Wells street, in Chicago, he thinks, and close to the Chicago & Northwestern depot, he thinks. He could not tell whether his sister lived one block, six blocks or twenty blocks from the depot. Asked what his sister's name was, he said, "Taylor, I think." Asked her husband's name, he said, "Taylor, I think." Asked how many days he worked at the tie yard, he answered, "I couldn't say."

The pole on which plaintiff had been working, and on which he was at the time of the accident, was in an alley west of Elston avenue, a street which lies northwesterly and southeasterly, and north of Armitage avenue. The pole was on the easterly side of the alley, and on the opposite or westerly side of the alley is the railroad wall, against which Beale and Hudson testified they were sitting when the accident occurred. There are houses on the easterly side of the alley. Ida Benn testified that in June, 1902, she lived on the west side of Elston avenue, and her kitchen window was in the back of the house toward the alley where the pole was, and that from the window, at which she was standing, she could see the plaintiff on the pole and his helper at the foot of the pole, and the retaining wall of the railroad and anyone in the alley, and that, at the time of the accident, which she says she saw, there was no one sitting by the retaining wall and no one in the alley except plaintiff's helper, who was at the foot of the pole. She said, on cross-examination, that she had been standing at the window, with her little boy, from about 12:30 o'clock, noticing the men at work on the pole, because she had not, before that time, seen any work of that kind done.

Ida Burr testified that the back yard of her resi-

dence was next to the alley where the pole was, and that her house was the nearest one to the pole; that she was out in her back yard with her children, and saw the man climb the pole, and that her little girl came to her and said to her the man was burning, and when she looked she saw he was burning. She says when she first saw the man on the pole she saw no one in the alley. On cross-examination she said: "When the man was burning up there I saw him burning up, and there was not a person down in the alley."

Mary McNulty testified, in substance, that she lived on the west side of Elston avenue, and didn't see the accident, but heard the noise. She was then about half a block from the pole, and she went onto her back porch, where she could see clearly, and saw a man on the pole, but no one else in the alley except a man running through it toward Elston avenue.

Emma Burr, daughter of Ida Burr, testified of telling her mother a man was burning, and says she saw no one in the alley.

The purpose of putting up new poles and stringing new wires is thus stated by Beale, the reference being to June 10th: "We drove over to Elston avenue that morning somewhere. We went over there to set four or five poles, to put in what is called a hurry-up call. We put that work in; it was just common, every-day setting poles. We had come down Armitage avenue to Ashland. We were going to put some new wires in, to connect to some old wires. The old wires were furnishing power and electricity to other people. We were going to put in these new wires to furnish power to the Naugle Tie Co. The Naugle Tie Co. wanted some power, some electricity, and we were there for the purpose of connecting new wires with some old wires to give them power in that yard." That the call was a hurry-up one is further evidenced by the fact that, June 11th, Beale received a telephone message from defendant's office to finish up the job at the works.

Plaintiff testified that the supply wagon was at Ash-

land and Clybourn avenues when Beale gave him the order to finish the work on the pole where he was injured, and Bagley testified the men were there when the order was given to cut in the wires, which, as before stated, meant connecting the old and new wires.

In reference to the time when the connection between the old and new wires was made, Beale testified as follows:

"Q. Were any of those new wires made alive on the 10th. A. No, sir.

Q. None of those three wires? A. No, sir.

Q. Were they all made alive at the same time? A. I couldn't say to the minute.

Q. About the same time? A. A matter of five or ten minutes."

Two linemen, Bagley and Nelson, connected the wires at the school-house, which is from six blocks to a mile south of where plaintiff was working. We think it evident from Beale's testimony that he did not know just when, on June 11th, the old and new wires were connected. He testified, in substance, that he left Bagley and Nelson at the school-house to make the connection, and then proceeded north to Elston avenue, and there is no evidence that he returned to the place of connection before the accident. Defendant's counsel say, in their argument: "One of the three wires upon which Rooney was working when injured had been cut in and made a live wire two or three days before Rooney went to work on the pole on the 10th and 11th." No reference is made to any evidence in support of this statement, for the reason, doubtless, that there is not a particle of evidence to support it. On the contrary, it is directly contradictory of the testimony of defendant's foreman, Beale, that the three wires were made alive in the afternoon of the eleventh and substantially at the same time.

Bagley, on cross-examination, testified that Nelson told him that one of the three wires had been connected up before. This was, of course, hearsay evidence, and

was not true, as shown by Bagley's examination in chief, which is: "There at the school-house I cut in three wires; three on the east side of the pole. They were the same wires I worked on on the first pole, and the same wires were run over to the pole where Rooney was hurt. When I first went up the pole at the school-house I found all three of the wires on the cross-arm hanging loose." In the abstract, a quotation of questions to and answers of plaintiff concludes with this question and answer:

"The Court: You knew they were not dead? A. I knew they were not dead."

Plaintiff seems to have been confused by the cross-examination, as the next questions and answers, which are omitted from defendant's abstract, are:

"Mr. Gray: You knew they were not? A. What do you say? I knew they were not dead?

Q. That is what you say? A. I knew they were dead. I was told they were dead."

There is no evidence that Bagley and Nelson, who were directed by the foreman to connect the old and new wires, and who went to the school-house for that purpose, had completed the connection when plaintiff ascended the pole to finish his work there. When the connection was made there was an electrical current of 4,500 volts passing through the wires where he was working. The crucial questions for the jury to decide were whether the current of electricity was turned onto the new wires before or after the plaintiff commenced work in the afternoon of June 11th, and if after that time, whether he knew of its having been turned on; and, in view of the conflict in the evidence, the decision of these questions depended on the credibility of the witnesses on the opposing sides. The jury and the presiding judge saw the witnesses and heard them testify, and observed their manner of testifying, and therefore had a much better opportunity of judging of the credibility of the testimony of the differing witnesses than we, who are confined to the mere record. The jury found

that the testimony of witnesses for the plaintiff was the more credible, and the presiding judge, in overruling defendant's motion for a new trial, approved the finding. We cannot say that the verdict is contrary to the evidence. On the contrary, after very carefully reading and considering the evidence, we concur in the finding of the jury.

The plaintiff was thoroughly competent and had long experience in his occupation. That he was careful is evidenced by the fact that, when he felt that a wire was affected by induction, he descended from the pole and procured rubber gloves, although the handling a wire so affected was not dangerous, but merely disagreeable to him in doing his work. In the afternoon of June 10th, when Beale called him from the pole in question to other work, he told Beale that he wanted to finish the work there before the transmission wires were put in. The plaintiff, from long experience, was thoroughly acquainted with the danger of handling live wires; yet the jury were asked by defendant to believe that he, knowing that the wires were charged with electricity, and having been cautioned, as defendant claims, a minute or two before the accident, deliberately handled them without rubber gloves, thus risking death. For instance: Beale testified that plaintiff said, just before the accident, that he knew it was hot, and the next thing he saw plaintiff was burning up. Hudson testified that after plaintiff threw down his rubber gloves, and after Beale hallooed to him, "Look out now, them are hot," plaintiff reached over and wrapped a piece of tape around the outside wire, by grasping his hand round the wire, to heat the tape and make it stick. Evidently the jury did not credit this and other similar evidence. We are inclined to think the fact to be that, in the hurry-up work which was being done, Beale forgot to inform the plaintiff that the current had been turned onto the wires, and without such information the plaintiff, who was from six blocks to a mile distant from where the old and new wires were connected, could not know that fact.

4.  Counsel for defendant say that, if plaintiff seeks
to recover because of the failure of defendant to warn
him of the intention to turn on the current, that is a
charge of negligence distinct from that averred in the
declaration, in the first count.  The answer to this is
twofold.  The negligence averred in that count is the
providing an unsafe and dangerous place in which to
work.

The duty of the master to exercise reasonable care
to furnish the servant a reasonably safe place in which
to work is not limited to the time when the servant
commences work, but is continuous, and if while the
servant is working at the place furnished by the mas-
ter, it is, by reason of the master's negligence, made
unsafe and dangerous, without the servant's knowledge,
and the servant is thereby injured, while exercising or-
dinary care, the master is liable.  C. & A. R. R. Co. v.
Eaton, 194 Ill. 441.

No variance of the evidence from the declaration was
pointed out on the trial, nor was it objected that there
was any such variance.  Therefore, variance, if any,
cannot be relied on here.  Alton Ry. Gas & Elec. Co. v.
Webb, 219 Ill. 563.  Other cases to the same effect are
numerous.

5.  Counsel for defendant contend that plaintiff as-
sumed the risk of being injured as he was.  The court,
by instructions given at defendant's request, submitted
to the jury the question whether plaintiff assumed the
risk, and the jury found, properly as we think, that
he did not.

6.  This contention is that the court erred in per-
mitting the plaintiff and other witnesses to testify as
to custom.

Plaintiff having testified that he knew, at the time
of the accident, the custom of defendant as to when
the electric current was turned onto the wires, was
asked, "What is it?" and answered: "The cutting in
is the last thing done at all times; and it is not only
by the Commonwealth, but it is universal all over the

country." The words "it is universal all over the country" were stricken from the answer on defendant's motion. We think the evidence competent. It tended to prove negligence on defendant's part, in departing from the usual course, which was known to plaintiff, and, therefore, might be relied on by him. St. L. Nat. Stock Yards v. Godfrey, 198 Ill. 289, 294; N. C. St. R. R. Co. v. Irvin, 202 *ib.* 345, 347; Chicago C'y Ry. Co. v. Lowitz, 218 *ib.* 24; Zentner v. Oshkosh Gas Light Co., 126 Wis. 196.

In the last case the court say: "As to the question of contributory negligence, the evidence shows that the deceased at the time of his death was engaged in the work at which he had been set by the superintendent of the defendant, and there is no evidence showing conclusively that he had not prosecuted that work with reasonable and ordinary dispatch and in the ordinary manner. He had the right to assume that the defendant's officer would conduct the business in the manner usual when repairs were being made, which, according to the evidence, required the cutting off of the current from the wires. It is not shown that he had any notice of intended departure from that custom. Such a departure involved an unusual and extraordinary risk, which, under the law, he did not assume, unless he had actual knowledge thereof, or unless, as a reasonably careful man, he, by the exercise of ordinary care, should have known of it."

Similar testimony was given by other witnesses, and to the testimony of one of them, defendant's witness Hughes, no objection was made. Even if the evidence were inadmissible, we cannot perceive how it could prejudice the defendant, because it seems the necessary course, in construction work, to complete the work before turning on the current.

7. It is contended that instructions 1 and 3, given at plaintiff's request, are erroneous. It is sufficient to say of instruction 1, that an instruction precisely identical with it was approved in Libby, McNeill & Libby v.

Scherman, 146 Ill. 540, 553. We find no error in the instruction. Instruction 3 is as follows:

"The jury are instructed that if, after fairly and impartially considering the testimony of all the witnesses in this case and the evidence and facts and circumstances in evidence before you in this case, you believe that the plaintiff at the time of, and prior to, the accident in question, exercised that degree of care for his own safety that an ordinarily prudent person would have exercised under the same circumstances and conditions, as shown by the evidence in this case, then you are instructed that you should find that the plaintiff was at and before the accident in question in the exercise of ordinary care for his own safety."

The objection made to this instruction is that it defines what constitutes ordinary care, and then directs the jury to find that the plaintiff exercised ordinary care. The instruction informs the jury that if they find from the evidence ."that the plaintiff, at the time of, and prior to, the accident in question, exercised that degree of care for his own safety that an ordinarily prudent person would have exercised under the same circumstances," they should find that he exercised ordinary care. In other words, the jury were informed that if they believed from the evidence that the plaintiff exercised ordinary care, as correctly defined in the instruction, they should so find. A similar instruction was held correct in Chicago Union Trac. Co. v. Chugren, 110 Ill. App. 545, and also on appeal to the Supreme Court, 209 Ill. 414, 430-31. We do not think instruction 3 even obnoxious to criticism.

8. Lastly, it is contended that the damages are excessive.

The position of the plaintiff when the accident happened, when he was "caught," to use the language of witnesses, is described by the witnesses in substantially the same way. Beale testified that the last thing he saw of him he was leaning over the wire and burning. Fox testified that he seemed to be lying across the wires. Hudson's testimony has been stated. Ida Benn,

plaintiff's witness, testified: "The first thing I noticed about the accident, I saw when his head flew up in the air and he started to balance over the wire; he hung over with his arms and commenced to burn. After the accident the current was turned off by cutting the wires, and some of the men ascended the pole and let plaintiff down by a rope, and when he was about half way down the rope broke and he fell to the ground." He was then taken to the Alexian Brothers' hospital, where he remained ten or eleven months, and then went to St. Elizabeth's hospital, where he was about two months. Dr. Stephen W. Cox testified that he had made four or five examinations of the plaintiff, the first about a year before the trial and the last the day he testified. He described his condition as follows:

"Beginning with the head, there is a scar across the forehead perpendicular in direction; it runs from the hair line down across the forehead onto the nose; there is another scar on the bridge of the nose reaching from one side of the nose to the other; it involves the whole arch of the nose. The scar on the forehead is narrower up and down, but widens at the upper part. It involves more of the surface near the hair than it does near the eyebrow. On each side of this scar the skin has a reddened or pimpled appearance covering the front part of the forehead. The skin adjoining it on the face is tender looking. Coming to the body, there is a scar running on the left side reaching from near the top of the breast bone around the body underneath the arm and covering most of the shoulder blade at the back. It measures from top to bottom on his back about nine and one-half inches, and from the bottom around under the arm to the point on the back about eleven inches. That scar involves the muscle that pulls the arm forward, called breast muscles. The muscle itself has been destroyed; that is, one of the two muscles in the chest has been partially destroyed; the scar tissue involves the whole of the arm pit. In place

of the arm pit is a ridge of skin that holds the arm down so that the arm cannot be moved quite to a horizontal position without tearing the skin. The shoulder joint is not involved in the bone, but it is somewhat stiffened. The elbow at the top has been broken off and the tissues destroyed, and a part of the bone gone. The left arm, around the big muscle of the arm, is marked also by a scar. The muscle itself, the large muscle, being almost destroyed. It measures only six inches around that arm, while around the right arm it measures twelve inches. The left arm is just half as large in circumference as the right arm. There are scars underneath the left arm also. There are some scars on the forearm and some on the leg which were not burned. They were places where the skin was taken off for skin grafting purposes. The left elbow is almost entirely stiffened, not quite solid, but almost; the left wrist joint is entirely stiffened. Three fingers are missing entirely off the left hand; the thumb is crooked, and is held in its place by a stiffened joint; the little finger is the same as the thumb; they are both useless. The palm of the hand is intact, never having been burned. On the front part of the wrist there are small scabs present now. Under the scabs are holes reaching into the bone. There is a scar on his arm that does not look like a burn, but looks like the arm had been operated on. It is in the shape of a ridge and is very much puckered. There are spots on his thighs and a scar on his left foot just in front of the heel in the hollow of the foot about the size of a silver dime. There is another spot on the right shoulder blade that looks like a burn. It is circular and in appearance red. That constitutes about all of my examination that I remember now.'' Witness further testified that he thought plaintiff's mental condition impaired.

The testimony of Drs. Patillo and Beard, eye specialists, is in substance that plaintiff's left eye is blind and the vision of his right eye about one-tenth of nor-

mal. Plaintiff testified that he suffered four or five operations of skin grafting. Also, that before the accident his eyesight was good and he did not wear glasses, and that since the accident his left eye is entirely blind, and with the right one, if the sidewalk is right and the day clear, he can get along pretty well. He says that since the accident he has not done work of any kind. Defendant introduced no evidence in regard to plaintiff's injuries, doubtless because medical witnesses could not be found to minimize them. That plaintiff was physically and mentally capable prior to the accident is sufficiently evidenced by the fact that up to the time of the accident he performed, to the satisfaction of the defendant, the duties of a lineman. The trial of the cause, so far as appears from the record, was fair and impartial. The contrary is not claimed, and in view of the evidence of the condition to which the plaintiff has been reduced by the accident, we do not think it can be reasonably said that the sum assessed as damages is any evidence that the jury were moved by passion, prejudice, partiality or undue sympathy. In short, we find no sound reason for holding the damages excessive.

The judgment will be affirmed.

*Affirmed.*